IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 25, 2005 Session

## REARNO VAUGHN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sumner County**
**Case No. 65-1999    Jane Wheatcraft, Judge**

---

**No. M2004-00544-CCA-R3-PC - Filed May 3, 2005**

---

The Petitioner, Rearno Vaughn, was convicted of one count of first degree murder, two counts of attempted first degree murder, two counts of attempted second degree murder, and one count of reckless endangerment, and the trial court sentenced him to an effective sentence of life plus twenty-two years.   This Court affirmed the convictions and sentences on appeal.   The Petitioner subsequently filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing.   On appeal, the Petitioner contends that the post-conviction court erred because he was denied the effective assistance of counsel.   Finding no reversible error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Tim R. Rector, Gallatin, Tennessee, for the Appellant, Rearno Vaughn.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

On August 28, 1996, a jury convicted R. Vaughn[1] of the first degree murder of Tyrone Smith, the attempted first degree murder of Ardell Williams, the attempted first degree murder of Keith

---

[1]In order to distinguish the petitioner in this case from his nephew, James Vaughn, who was also convicted of these crimes and is the petitioner in another case currently before this Court, we will refer to this petitioner as "R. Vaughn" and to his nephew as "J. Vaughn."

Goodrich, the attempted second degree murder of Chris Williams, the attempted second degree murder of Tallis Bonds, and one count of reckless endangerment. This Court summarized the facts on direct appeal as follows:

> The State's proof at trial demonstrated that in the early morning hours of July 2, 1995, several individuals were gathered around a picnic table outside a restaurant known as Wing-It, located in Gallatin, Tennessee. These individuals were socializing. Several of these individuals were drinking alcohol or using illegal narcotics, or both. It appears that a tractor-trailer was parked adjacent to the picnic table. Several of the socializing individuals observed one or two pair of feet underneath the trailer. Immediately thereafter, the Defendant and James Vaughn emerged onto the scene and began shooting at various individuals in the crowd with handguns. The socializing individuals fled in a general panic. Given the confusion generated by the flight, the observations of what transpired differed among various individuals.
>
> Two individuals, Chris Williams and Ardell Williams, did not see who had done the shooting. Ardell Williams testified that he had seen one pair of feet underneath the trailer prior to the shooting. Chris Williams, who was urinating a short distance away from the picnic table when the shooting began, did not observe anything underneath the trailer. Both individuals fled when they heard shots fired, but both were wounded. Ardell Williams suffered five gunshot wounds to his left leg and one to his left ankle. Chris Williams suffered a single gunshot wound to his right buttock. Tallis Bonds and Hygo Lyles saw only James Vaughn doing the shooting. Both individuals observed two pair of feet underneath the trailer prior to the shooting. Neither individual saw the Defendant at the scene. Tallis Bonds suffered gunshot wounds to his right thigh and his left foot. Hygo Lyles was not wounded.
>
> Two individuals, Keith Goodrich and Lemarcus Rickman, saw both James Vaughn and the Defendant at the scene. Goodrich observed two pair of feet underneath the trailer prior to the shooting. Goodrich and Rickman both saw James Vaughn step out from behind the trailer and begin shooting. In fleeing the shooting, Goodrich ran into the Defendant. The Defendant pointed a handgun directly at his chest and told him to empty his pockets. Without waiting for Goodrich to act, the Defendant pulled the trigger of the handgun. Goodrich heard a click, but the gun did not fire. Goodrich then ran away from the Defendant. During his flight from the scene, Rickman observed Goodrich run into the Defendant. Rickman saw the two individuals standing face to face, but did not see a gun in the Defendant's hands.
>
> Another individual, Alonzo Rogan, saw only the Defendant during the shooting.

Rogan was talking on a cellular telephone as the shooting began and did not observe any feet underneath the trailer. Upon hearing shots fired, Rogan fled the scene. During his flight, he saw Keith Goodrich run into the Defendant. Rogan observed the Defendant pointing a gun at Goodrich.

The State offered additional proof placing the Defendant near the scene of the shooting at the time of the shooting. Several witnesses, including some of the ones socializing at Wing-It, testified that they had seen the Defendant earlier in the evening at a club called Big Robert's and at an establishment known as Julio's. Latonya Alexander testified that she gave the Defendant a ride from Julio's to Wing-It in the early morning hours of July 2, 1995. Furthermore, Alice Mason testified that she saw the Defendant pull on black pants over his clothing while in a car in the parking lot of Wing-It.

Several individuals were wounded as a result of the shooting. Chris Williams was shot once in the right buttock. Ardell Williams was shot five times in the left leg and once in the left ankle. Tallis Bonds was shot once in the right thigh and once in the left foot. Tyrone Smith was shot once in the left leg and once in the chest cavity. The wound to Smith's chest cavity entered in the left side of his abdomen and exited through the right side of his chest, causing injuries to his internal organs. Tyrone Smith died as a result of this wound.

Officers discovered numerous shell casings and bullet fragments at the scene. The shell casings and bullet fragments were all either .45 caliber or .38/.357 caliber. [FN2] Officers also discovered a .38 caliber semi-automatic handgun on a table inside Wing-It. That handgun had a live round in the chamber, and a live round was found on the table beside the gun. Officers were not able to determine the owner of the .38 caliber semi-automatic handgun.

> FN2. Officer Jerry Hickman of the Gallatin Police Department testified that the shell casing for a .357 caliber is the same size as one for a .38 caliber.

The State introduced further proof linking the Defendant to the crime. The Defendant's brother, "Chuckie" Vaughn, was shot and killed in February of 1995 by Gerome Smith, the twin brother of Tyrone Smith, one of the victims of the Wing-It shooting. In addition, Tyrone and Gerome Smith were founding members of the Zone 8 gang. According to Detective Susan Morrow, the Vaughns (Rearno, James and "Chuckie") did not get along with the members of the Zone 8 gang.

From interviews after the shooting, Gallatin Police Department officials developed James Vaughn and the Defendant as suspects. Arrest warrants were issued for both individuals, but neither suspect could be located. Police eventually received information that two individuals were going to meet with the Defendant and James Vaughn in Alabama. Police conducted surveillance of these individuals and observed them leave Gallatin at approximately 9:30 a.m. on July 25, 1995. They were driving a blue Mitsubishi down Interstate 65 South at speeds in the seventy to ninety mile per hour (70--90 mph) range. Several law enforcement officers were following the blue Mitsubishi in unmarked cars. Upon reaching Alabama, the blue Mitsubishi exited the interstate and quickly re-entered the interstate in the opposite direction. The police officers following the blue Mitsubishi lost contact with the car at this point.

After they had lost contact with the blue Mitsubishi, the police officers stopped and arranged a meeting with officers from the Alabama Bureau of Investigation. At this meeting, the officers developed information that James Vaughn and the Defendant had relatives in Sheffield, Alabama. Those relatives, apparently Brenda and George Simpson, occupied a home at 612 East 17th Street. The officers telephoned the Sheffield Police Department and asked them to drive by the Simpson residence to check for the presence of a blue Mitsubishi. Sheffield police officers did so and found that the blue Mitsubishi was indeed at the Simpson residence. Gallatin police officers arrived on the scene and conducted surveillance of the Simpson residence. Officers soon observed James Vaughn and the Defendant on the front porch. They were entering and exiting the home freely. In addition, a car pulled up to the front of the residence and an occupant of the car yelled "Fuzz" to the individuals standing on the front porch. James Vaughn, whose nickname is "Fuzz," approached the car.

With this information, Gallatin police officers requested the assistance of Sheffield police officers in obtaining a search warrant for the Simpson residence so that they could arrest the Defendant and James Vaughn. Detective Greg Ray of the Sheffield Police Department went to the courthouse to obtain two fugitive warrants for the suspects and a search warrant for the Simpson residence. While Detective Ray was in the process of securing the warrants, one of the suspects exited the home, got in the blue Mitsubishi and drove away. Police officers could not determine which of the two suspects was the driver at that time. Officers decided to stop the vehicle and arrest the suspect once the car was out of sight of the Simpson residence. Sheffield police officers stopped the vehicle a short distance from the Simpson residence. The driver was the Defendant. During the stop, residents of the neighborhood were yelling to the Defendant, "Run, run, you haven't done anything wrong." The Defendant ran from the officers, fleeing in the direction of the Simpson residence.

–4–

He was finally apprehended approximately one hundred yards from the residence, but in clear view of the home. During the chase of the Defendant, the officers who were conducting surveillance of the Simpson residence left their positions to aid in the pursuit. As a result, when the Defendant was captured, the Simpson residence was not secure.

After the capture and arrest of the Defendant, officers secured the Simpson residence again. Several occupants of the residence came outside and a heated verbal exchange with the police officers ensued. Officers asked permission to search the home but were denied consent. Accordingly, the officers at the scene contacted Detective Ray with regard to the search warrant. They informed him that the Defendant had been captured and, therefore, the warrant need only specify James Vaughn. Detective Ray obtained the warrant to search the Simpson residence for the person of James Vaughn and returned to the scene. During this time, the Defendant was pleading with officers to allow him to talk James Vaughn into coming out of the house. The Defendant admitted that there were numerous guns inside the residence and begged the officers not to kill James Vaughn.

Members of an Alabama tactical team arrived to search the home. The search of the main living space of the home revealed nothing. Officers did, however, locate an entrance to an attic in one of the home's closets. Officer Steve Bearden climbed into the attic to conduct a search for James Vaughn. Upon entering the attic, he discovered two handguns, a Smith and Wesson .357 revolver and a Smith and Wesson .38 model 10 revolver with the serial number filed off of it. He secured the guns for safety purposes, handed them to another officer just outside the entrance to the attic, and continued the search for James Vaughn. James Vaughn was not found in the Simpson residence. After completing the search of the home, officers asked the occupants of the home if the guns found in the attic belonged to them. None of the occupants claimed ownership of the guns. Officers took possession of the guns and marked them as evidence.

Agent Tommy Heflin of the Tennessee Bureau of Investigation, a firearms identification expert, examined the bullet fragments and shell casings recovered from the scene of the shooting. He also examined the two handguns seized from the Simpson residence in Alabama, the .38 caliber semi-automatic handgun recovered from Wing-It, and a .45 caliber semi-automatic pistol seized during an arrest by a drug task force officer. Heflin testified that all of the bullet fragments and shell casings recovered from the scene or from the victims were either .45 caliber or .357 caliber. The .45 caliber shell casings were all fired from the same weapon and the

weapon was either a semi-automatic or an automatic. The .45 caliber bullet fragments may have all been fired from the same weapon, but Heflin could not be positive because of damage to the bullet fragments. From an examination of the .45 caliber handgun submitted for comparison purposes, Heflin was able to determine that the .45 caliber semi-automatic handgun he examined was not the source of the bullet fragments or the shell casings recovered from the scene of the crime.

Heflin also examined the .38 caliber semi-automatic handgun recovered from the table inside Wing-It and the .38 caliber model 10 revolver recovered from the Simpson residence. Heflin testified that none of the shell casings or bullet fragments recovered from the scene were fired from either of these weapons.

Heflin examined the .357 revolver recovered from the Simpson residence. From his examination, he matched the .357 revolver to five .38/.357 shell casings found at the scene of the shooting. Heflin also matched the .357 revolver to four bullet jackets or bullet fragments recovered from the scene of the shooting. Finally, Heflin matched the .357 revolver to the bullet recovered from Chris Williams' right buttock.

Heflin also examined clothing from some of the victims of the shooting. In particular, Heflin examined Tyrone Smith's pants and shirt and found holes which were consistent with a .38/.357 bullet. Heflin examined Ardell Williams' socks and found holes consistent with a .38/.357 bullet. Ardell Williams' jeans contained three holes consistent with a .44/.45 bullet and two holes consistent with a .38/.357 bullet.

The Defendant did not testify in his own behalf at trial. He did, however, offer the testimony of two witnesses in an attempt to establish an alibi. Willissa Malone testified that in the early morning hours of July 2, 1995, she was at a club known as Big Robert's. Big Robert's was approximately two to three blocks away from Wing-It. Malone stated that she saw the Defendant gambling outside Big Robert's shortly before hearing shots fired in the direction of Wing-It. On cross-examination, Malone admitted that she did not know where the Defendant was at the time she heard the shots being fired.

The Defendant also offered the testimony of Robin Rice Malone. Robin Rice Malone testified that she was also at Big Robert's in the early morning hours of July 2, 1995. Like Willissa Malone, Robin Rice Malone stated that she saw the Defendant outside Big Robert's shortly before hearing shots fired. Robin Rice Malone added that she saw the Defendant outside Big Robert's immediately after hearing the shots fired. In rebuttal, the State offered the testimony of Detective Susan Morrow, who had interviewed Robin Rice Malone shortly before the Defendant's

trial. According to Morrow, Robin Rice Malone stated in the interview that she had seen the Defendant running on Blythe Street immediately after hearing the shots fired. Blythe Street is apparently not by Big Robert's, but is in the general area behind Wing-It.

The Defendant was indicted on one count of first degree premeditated murder (Tyrone Smith), four counts of attempted first degree premeditated murder (Chris Williams, Tallis Bonds, Ardell Williams, Keith Goodrich), and one count of reckless endangerment. He was tried from August 26 to August 28, 1996. After considering the proof presented at trial, the jury found the Defendant guilty as charged on all counts except the attempted first degree murders of Chris Williams and Tallis Bonds, for which the jury found the Defendant guilty of the lesser offense of attempted second degree murder.

State v. Rearno Vaughn, No. 01C01-9703-CR-00086, 1998 WL 171679, at *1-5 (Tenn. Crim. App., at Nashville, Apr. 14, 1998), *perm. app. denied* (Tenn. Dec. 14, 1998). The trial court sentenced R. Vaughn to life imprisonment for first degree murder, thirty-five years for each count of attempted first degree murder, eighteen years for each count of attempted second degree murder, and four years for reckless endangerment. Id. at *1.

On February 1, 1999, R. Vaughn filed a pro se petition for post-conviction relief, which was later amended by appointed counsel. The amended petition alleged, in pertinent part, that R. Vaughn's trial counsel was ineffective by: (1) failing to object to the trial court's instruction to the jury regarding the definition of the mens rea of "knowingly"; (2) failing to object to or appeal the trial court's instruction to the jury about the minimum release eligibility date for the first degree murder offense; and (3) failing to adequately prepare for trial, investigate the case, or communicate with R. Vaughn. Further, R. Vaughn asserted that his trial counsel's ineffectiveness prejudiced him.

The following evidence relevant to R. Vaughn's claims was presented at the hearing on his petition for post-conviction relief:[2] Roger A. Sindle ("Counsel Sindle") testified that he represented R. Vaughn. He said that he has been practicing law since 1982, and half of his practice consists of criminal law. Counsel Sindle said that he discussed R. Vaughn's case with R. Vaughn on multiple occasions, and he also discussed the case with J. Vaughn's defense attorney, Walter Stubbs ("Counsel Stubbs"). He said that he and Counsel Stubbs discussed that both of their clients had

---

[2]The post-conviction court held one hearing on both J. Vaughn's and R. Vaughn's petitions for post-conviction relief. J. Vaughn has also appealed the post-conviction court's denial of his petition to this Court. We are issuing separate opinions in each of the appeals, but many of the facts and witnesses that were presented at the post-conviction hearing are the same in both appeals. Accordingly, we refer to the parties involved in a manner that will be clear in both opinions.

instructed them not to involve their Alabama relatives in the defenses of these cases. Counsel Sindle said that he met with R. Vaughn on three occasions, and on other occasions before or after trial.

Counsel Sindle's defense strategy was two pronged. The first prong was to develop an alibi defense, and the second prong was to attack the credibility of the State's witnesses concerning what occurred on the night of the attack. Counsel Sindle said that he attempted to get R. Vaughn's alibi witnesses, and he tried to get R. Vaughn's mother involved to assist him in finding these witnesses. Counsel Sindle said that there were a number of the State's witnesses that he did not interview. He said that, in his experience, it is adequate to review the witness' narrative. Further, he indicated that he did not interview other witnesses because his focus was to establish the Petitioner's alibi. Counsel Sindle testified that he called Robin Rice Malone to help establish R. Vaughn's alibi defense. He said that, in rebuttal, the State called Detective Marrow, who testified that Malone gave the police a statement that was directly contradictory to Malone's trial testimony. Malone told Counsel Sindle that she was with R. Vaughn at the time that the shots in this case were fired, but she told Detective Marrow that she was not with R. Vaughn at the time that the shots were fired, and, shortly after hearing gun shots, she saw R. Vaughn running near where the shooting occurred. Counsel Sindle said that he asked Malone if she had given any other statements to the police prior to trial, and Malone said that she had not. Counsel Sindle agreed that Detective Marrow's impeaching of Malone was damaging to R. Vaughn's alibi evidence.

Counsel Sindle said that he did not have his file for this case because it is his practice to destroy closed files that are over one year old. He could not say with certainty, but he thought that he discarded R. Vaughn's file before he learned of this post-conviction proceeding. Counsel Sindle said that he observed some of J. Vaughn's trial, and he used these observations to develop a trial strategy and to determine which witnesses he thought would come across well to the jury in R. Vaughn's trial. Counsel Sindle said that there were credibility problems with many of the witnesses, and, therefore, he had to decide whether the witnesses would do more harm than good to R. Vaughn's case. Further, Counsel Sindle said that R. Vaughn told him that the State's witnesses were only putting blame on him because of the conflict that his family had with the witnesses' gang. Counsel Sindle said that he attempted to "plant" the idea that the victims of this crime had conflict with multiple other people and with members of other gangs.

Counsel Sindle testified that he filed a motion to suppress the weapons found in Alabama based upon the theory that the search was illegal. The trial court ruled that R. Vaughn did not have standing to contend that the search was illegal, and only the owners of the Alabama house that was searched had standing. However, Counsel Sindle conceded that there was a potential second issue with the search, namely that the search extended beyond the scope of the search warrant. He said that the issue of the scope of the warrant was discussed in a court hearing, and the trial court determined that the search did not extend beyond the scope of the warrant. Counsel Sindle said that he did not go to Alabama to view the home that was searched, and he did not talk to the officer who

found the weapons in the home. He conceded that there were many details about the Alabama house that he did not know.

Counsel Sindle said that he and Counsel Stubbs had numerous conversations about how Counsel Stubbs was going to approach his case and the motions that both attorneys were going to file. He testified that he was unsure whether Counsel Stubbs filed a motion to have the jury sequestered, but he understood that R. Vaughn had the right to a sequestered jury. Counsel Sindle said that he did not request a sequestered jury because he believed that it would be a disadvantage to R. Vaughn. He said that, if you have a sequestered jury, you run the risk that the jury will be upset and not be as willing to take their time with the evidence because they want to get home.

Counsel Sindle testified that he filed, and was granted, a motion in limine to keep the State from mentioning R. Vaughn's prior criminal record and the fact that he was incarcerated. At trial, Detective Morrow mentioned that R. Vaughn was incarcerated. Counsel Sindle did not object to the testimony because he did not want to overemphasize it to the jury, but he expressed his concern to the trial court during a sidebar. Counsel Sindle did not file a motion for a mistrial. He said that there were a lot of reasons for not requesting a mistrial, one of which was that he was unsure whether his witnesses would be available if the trial was rescheduled. Counsel Sindle appealed this issue, and this Court found that it was waived for his failure to object on the record.

Counsel Sindle said that he did not recall how the jury was charged with regard to the range of punishment that R. Vaughn would face if the jury found him guilty. He said that he was unaware that there was a statute that had changed the minimum range of punishment for a life sentence. Counsel Sindle clarified that he was not sure that, at the time of R. Vaughn's sentencing, it had been determined that the statute did, in fact, change the range of punishment. He said, "I'm not sure that anyone knew . . . the way the statute was interpreted at that time." Counsel Sindle testified that the jury in this case was instructed, "The punishment for the offense of murder in the first degree is life imprisonment. Should you return a verdict of guilty, the Court will impose a sentence of life imprisonment, which carries a minimum of 25 calendar years." Counsel Sindle agreed that this statement is currently incorrect, but disagreed that this statement of law was known to be incorrect or misleading at the time of this trial. Counsel Sindle said that he did not object to the trial court's instructions to the jury with regard to the culpable mental state required for each crime. He said that he did not object because he did not think that the charges were misleading or misstated.

On cross-examination, Counsel Sindle testified that he met with R. Vaughn on a number of occasions, both in the courthouse and in the prison. He said that they discussed trial strategy, and he explained the ramifications of the law and the facts, as he understood them, to R. Vaughn. R. Vaughn did not voice any disagreement with Counsel Sindle's perception of the law and the facts or with his handling of the case. Counsel Sindle said that he filed an appeal on R Vaughn's behalf on May 6, 1997, and, at that time, he believed that the minimum range for a life sentence was

twenty-five years in prison. Sometime after he submitted the briefs in this case he learned that, according to the Attorney General's opinion, the minium range for a life sentence was fifty-one years. Further, he said that the Court of Criminal Appeals opinion that made this change clear in the law was not filed until two or three years after his representation of R. Vaughn had ceased.

Counsel Sindle testified that he was the second attorney appointed to R. Vaughn. He said that R. Vaughn's first attorney had a conflict with R. Vaughn. The first attorney had hired a private investigator to investigate the case, and Counsel Sindle was given a report from this investigator. He also discussed the case with the first attorney, and he discussed the case with Counsel Stubbs. Counsel Sindle testified that he also spent time reviewing the trial transcript from J. Vaughn's trial. He also reviewed the transcripts with R. Vaughn to discuss how they could best cross-examine the State's witnesses. Counsel Sindle also reviewed the transcript from R. Vaughn's preliminary hearing and compared the State's witnesses' testimony in the preliminary hearing with their testimony in J. Vaughn's trial so he could use any inconsistencies when cross-examining the State's witnesses in R. Vaughn's trial. Counsel Sindle testified that he did not contact the owners of the Alabama house where the weapons were found because R. Vaughn directly or indirectly told him that neither he nor J. Vaughn wanted the Alabama relatives involved in this trial.

Steven Keith Bearden, trooper with the Alabama State Troopers, said that he testified in the trials of both R. Vaughn and J. Vaughn and also in the motion to suppress hearing. Trooper Bearden said that he was involved in the search of the Alabama house where the weapons in this case were found on July 25, 1995. He said that, during the search, he was looking for J. Vaughn, and he searched the attic for J. Vaughn. The trooper testified that the entrance to the attic was inside a closet, and he climbed into the hole with another detective's assistance. The trooper said that he entered the attic, which was a relatively low attic with a crawl space, and he immediately saw two handguns. The trooper handed the two guns to the other officers, and he then continued to search the attic using a flashlight. The trooper identified photographs of the entrance to the attic.

On cross-examination, the trooper said that the search of the Alabama house began shortly after 9:00 p.m. He said that there were multiple officers present, and each officer was assigned a specific area of the house to search. The trooper testified that he could not stand inside the attic, but there was enough room for a person to be hiding. Trooper Bearden said that he did not search any drawers, and he did not overturn a mattress during the search. The trooper did not have any information as to whether J. Vaughn lived in Alabama, and the only information he had was that there were murder suspects that were believed to be in Sheffield, Alabama and that a search warrant had been obtained. The trooper said that he is 6'1" and weighs 170 pounds.

Sammy Alexander testified that he encountered Keith Goodrich in the hospital immediately after the shooting. Alexander said that Goodrich approached him and asked him if he had a gun for sale. Alexander told Goodrich that he did not have a gun for sale, and then asked why he wanted a

gun, and Goodrich responded "I don't know . . . they had a ski mask on." Alexander said that the he testified at J. Vaughn's trial, and, at trial, his testimony was that Goodrich said "I don't know, man. Them nig**** had ski masks on them, but it had to be Fuzz and them." Alexander said that he told J. Vaughn's attorney about his prior record. On cross-examination, Alexander testified that, as a juvenile, he was convicted of voluntary manslaughter.

Brenda Fay Vaughn Freeman testified that she was renting the house that was searched in Alabama at the time that the search warrant in this case was executed, and she had lived there for four or five years. She said that R. Vaughn was her brother, and he had come to visit her ten days prior to the search. She said that R. Vaughn's mother knew that he was visiting her, and he had his own room in the house that he would stay in when he came to her home. Freeman testified that R. Vaughn and J. Vaughn shared a key to the home, and they both had their own beds in the home. R. Vaughn did his laundry there, and he cooked most of his own meals in the home. She said that he visited her on many occasions prior to this one, and J. Vaughn had previously spent the summer at her house. Freeman said that J. Vaughn was not at her house on the day that it was searched.

Freeman testified that the house was a one-floor house. She said that there was an area in the house that had a small opening to the attic. The opening had previously been used as a chimney with an exhaust stack that went up through the attic. At the time of the search, she stored tools, an ax, a sling blade, and a wagon in the closet. Freeman said that, the night of the search, R. Vaughn had been at Freeman's daughter's house and to the grocery store. She said that, when R. Vaughn and Freeman's daughter brought the groceries to the house at around 5:00 p.m., the police pulled up and told R. Vaughn to stop. The police arrested R. Vaughn, and then returned around 9:00 p.m. with a search warrant for the home. Freeman said the search lasted approximately forty-five minutes, and her house looked "[l]ike a tornado" had gone through it when the police were done. She said that all of the mattresses were off of the beds, and all of the contents of the drawers were lying on the floor. Freeman said that all of the items in the closet, where the chimney hole to the attic was, were still undisturbed.

Freeman testified that neither Counsel Sindle nor Counsel Stubbs ever contacted her. Freeman said that she would have been willing to talk to either attorney, and she would have testified at either or both trials. Freeman said that she had never seen either of the guns that were confiscated by police in her home. She said that she never told either R. Vaughn or J. Vaughn that she did not want to talk to their lawyers.

On cross-examination, Freeman said that R. Vaughn and J. Vaughn came down to visit her together. She said that J. Vaughn was staying with her at the time that the search warrant was executed, but he had gone to visit a friend. She said that J. Vaughn was living at her house on July 25, 1995. She said that George Simpson, her son, was also living with her at that time. Freeman testified that neither J. Vaughn or R. Vaughn went into her attic and neither could fit in the attic.

Freeman said that between the time that J. Vaughn and R. Vaughn were arrested and until their trial she returned to Tennessee at least five times. On those occasions, she never attempted to see either J. Vaughn or R. Vaughn, and she never contacted either of their attorneys.

George E. Simpson, Jr., testified that Freeman is his mother. He said that, on July 25, 1995, he was twenty-two and was living with his mother in Alabama. Simpson testified that the house was approximately 1000 square feet and that it had four bedrooms, a kitchen, a living room and a bathroom. Simpson said that R. Vaughn was living with him and his mother at the time, and R. Vaughn had brought clothes when he came to stay with them. Simpson identified pictures of the hole in the closet ceiling that goes to the attic. He said that the hole used to be a chimney, and that, to get to the hole, you had to remove garden tools, sling blades, a wagon and bikes. Simpson testified that the hole measured thirteen inches by fifteen inches. He said that approximately six officers searched the home, and the search lasted about one hour. Simpson said Counsel Sindle or Counsel Stubbs never contacted him, and he said that, had he been contacted, he would have testified on R. Vaughn's and J. Vaughn's behalf. On cross-examination, Simpson said that R. Vaughn and J. Vaughn came together to visit Simpson and his mother. He said that, when R. Vaughn was arrested, J. Vaughn was at a girl's house. He said that he never saw the guns that the officers found, and he was unaware that there were any guns in the house.

The post-conviction court ruled that the testimony of Thomas D. Walker was inadmissible, but R. Vaughn made an offer of proof with respect to this testimony. Walker testified that he remembered the shooting in this case, and he was related to one of the victims. He said that, the night of the shooting, he saw R. Vaughn at a store. Walker testified that, when the first shots were fired, he was in the same parking lot with R. Vaughn, and he saw R. Vaughn leave shortly after the shots were fired. On cross-examination, Walker testified that he told the investigator in this case what he had seen, and he said that Counsel Sindle never contacted him. The State noted that Counsel Sindle's list of alibi witnesses did not include this witness, and the post-conviction court found that it was unfair to admit this testimony at this point.

R. Vaughn testified that Counsel Sindle never discussed issues about the jury or the possibility of jury sequestration with him. R. Vaughn said that he wrote Counsel Sindle a letter telling him that he wanted Counsel Sindle to file a motion to suppress the weapons found in Alabama, and he told Counsel Sindle to contact his sister, Freeman, who was renting the home that was searched. In addition, he provided Counsel Sindle with Freeman's address and phone number. R. Vaughn testified that he also wrote Counsel Sindle about his motion to suppress, the preparation of his case, and any potential alibi witnesses. He said that he knew that Counsel Sindle did not contact any of his alibi witnesses because they were not in court. R. Vaughn said that Counsel Sindle never discussed anything about the .45 gun or about the potential testimony of a witness named Alexander with him. He said that, had he known about Alexander's testimony, he would have wanted him to testify at his trial. Additionally, R. Vaughn said that Counsel Sindle never

discussed other possible suspects or his release eligibility date with him. He said that, in fact, he did not learn that his sentence was more than twenty-five years until he was given a time sheet while incarcerated that stated that he must serve fifty-one years before he is eligible for parole.

On cross-examination, R. Vaughn said that he met with Counsel Sindle on multiple occasions, and Counsel Sindle came to see him in prison four times. He said that he was arrested in Alabama on July 25, 1995, and he had been there for eight to ten days. He said that J. Vaughn came with him to Alabama and that they were staying together at the Freemans' house. R. Vaughn said that he did not know where J. Vaughn was when R. Vaughn was arrested, but, at that time, they were still staying at Freeman's house together. R. Vaughn said that he wanted Counsel Sindle to talk to Freeman because she was renting the house where the guns were found. He also testified that he had never been in the attic of Freeman's house, and he did not know anything about the guns. R. Vaughn said that he did not know whether J. Vaughn put anything in the attic. R. Vaughn conceded that he has an extensive criminal history that included multiple felony convictions, and he conceded that Counsel Sindle discussed the transcript from J. Vaughn's trial with him. R. Vaughn said that he gave Counsel Sindle the names of ten alibi witnesses to follow up with. R. Vaughn said that he was unsure whether he expressed his dissatisfaction with Counsel Sindle's representation to Counsel Sindle, and he did not express his dissatisfaction to any of his relatives or to the judge.

Susan Morrow, a detective with the Gallatin Police Department, testified that the .45 handgun used in the shooting in this case was discovered underneath the front seat of a car in June of 1996, which was after J. Vaughn's trial in May of 1996. On cross-examination, the detective testified that the casings from the .45 handgun found in the Sheffield, Alabama house did not match the casings from the .45 used in the shooting. On redirect examination, Detective Morrow testified that the .45 handgun found in the car in June of 1996 was not used in J. Vaughn's trial, since it was discovered after his trial, but it was used during R. Vaughn's trial.

## II. Analysis

On appeal, R. Vaughn contends that the post-conviction court erred when it dismissed his petition because Counsel Sindle failed to: (1) object to the trial court's jury instruction regarding the mens rea of "knowingly"; (2) object to or appeal the trial court's instruction to the jury about the minimum release eligibility date for first degree murder; and (3) adequately prepare for trial by failing to view the area of the house where the gun was found by police and by failing to interview witnesses regarding this evidence. Further, R. Vaughn asserts that his trial counsel's ineffectiveness prejudiced him.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition

−13−

for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). A post-conviction court's factual findings are subject to a <u>de novo</u> review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. <u>Fields v. State</u>, 40 S .W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely <u>de novo</u> review by this Court, with no presumption of correctness. <u>Id.</u> at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. <u>State v. White</u>, 114 S.W.3d 469, 475 (Tenn. 2003); <u>State v. Burns</u>, 6 S.W.3d 453, 461 (Tenn. 1999); <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. <u>Burns</u>, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to a <u>de novo</u> review. <u>Id.</u>

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. <u>Baxter</u>, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. <u>Id.</u> at 687; <u>Cooper v. State</u>, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. <u>Strickland</u>, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." <u>Id.</u> at 694; <u>see</u> <u>also</u> <u>Harris v. State</u>, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. <u>Strickland</u>, 466 U.S. at 690; <u>State v. Mitchell</u>, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. <u>Strickland</u>, 466 U.S. at 690; <u>Cooper</u>, 849 S.W.2d at 746; <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Burns</u>, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. <u>Williams v. State</u>, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. <u>House v. State</u>, 44 S.W.3d 508, 515 (Tenn. 2001) (citation omitted); <u>Thomas Brandon Booker v. State</u>, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim.

–14–

App., at Jackson, Mar. 24, 2004), *no perm. app. denied* (Tenn. June 21, 2004).  However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.  House, 44 S.W.3d at 515.

### A.  Failing to Object to, or Appeal, Jury Instructions
### 1. "Knowingly" Instruction

R. Vaughn contends that Counsel Sindle was ineffective by failing to object to the trial court's instruction on the mens rea of "knowingly" with respect to the second degree murder charge, citing State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD, 2001 WL 91794 (Tenn. Crim. App., at Jackson, Jan. 30, 2001), *no perm. app. filed* and State v. Page, 81 S.W.3d 781 (2002).  With regard to second degree murder, the trial court instructed the jury:

> Second-degree murder.  Any person who commits second degree murder is guilty of a crime.
>
> For you to find the Defendant guilty of this offense the State must prove beyond a reasonable doubt the existence of the following essential elements:
>
> 1.  That the Defendant unlawfully killed the alleged victim; and
> 2.  That the Defendant acted knowingly.  Knowingly means that a person acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.  A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The post-conviction court found the cases cited by R. Vaughn were "decided five and six years . . . after the trial of [R. Vaughn]."  Further, the trial court stated, "The Court does not find counsel ineffective for his failure to raise the issues decided by Page.  It is unfathomable to think that all cases tried before Page was decided in 2002 have to be retried.  The instructions given reflected the law and the pattern jury instructions in effect in 1996."

We agree with the post-conviction court.  In Page, this Court changed the law with respect to the definition of "knowingly," the required mens rea for second degree murder, holding that second degree murder is strictly a "result of conduct offense," and a jury instruction allowing a jury to convict on second degree murder based only "upon awareness of the nature of the conduct or circumstances surrounding the conduct" improperly lessened the State's burden of proof.  Id. at 788. After this decision, there were multiple post-conviction petitions filed by petitioners alleging that their trial attorneys were ineffective for failing to appeal the issue decided in Page, even though their appeals were filed and decided prior to the release of the Page decision.  In the face of this issue, in

–15–

Corwyn E. Winfield v. State, No. W2003-00889-CCA-R3-PC, 2003 WL 22922272 (Tenn. Crim. App., at Jackson, Dec. 10, 2003), *perm. app. denied* (Tenn. May 10, 2004), this Court noted that, while it was arguable that appellate counsel could have anticipated the Page holding, counsel's performance was not deficient for failing to anticipate a change in the law with regard to the jury charge on the mens rea of "knowingly." Id. at *10. Similarly, in Ernest B. Eady v. State, No. E2002-03111-CCA-R3-PC, 2004 WL 587639 (Tenn. Crim. App., at Knoxville, Mar. 25, 2004), *perm. app. denied* (Tenn. Oct. 11, 2004), the Court concluded that the petitioner's trial counsel was not ineffective for failing to raise the "knowingly" issue on appeal because the first appellate decision reversing a conviction based upon an incorrect "knowingly" instruction was released shortly before this Court released the decision in Eady's direct appeal. Id. at *8. The Eady Court cited the Wisconsin Court of Appeals for the proposition that "'ineffective assistance of counsel cases should be limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue.'" Id. at *8 (quoting State v. McMahon, 186 Wis.2d 68, 519 N.W.2d 621, 628 (Wis. Ct. App. 1994)). The Page decision was released almost six years after J. Vaughn's trial. We find our reasoning and analysis in Winfield and Eady to be persuasive, and we conclude that R. Vaughn has not met his burden of showing that Counsel Sindle's performance was deficient. This issue is without merit.

## 2. Release Eligibility Instruction

R. Vaughn next alleges that Counsel Sindle was ineffective for failing to object to the trial court's instruction to the jury regarding the release eligibility date for a life sentence. The trial court instructed the jury, "The punishment for the offense of murder in the first degree is life imprisonment. Therefore, . . . should you return a verdict of guilty, the Court will impose a life sentence, which carries a minimum of 25 calendar years." When deciding whether Counsel Sindle was ineffective for failing to request a different jury instruction, or failing to appeal this instruction, the post-conviction court found:

> The law changed effective July 1, 1995 regarding release eligibility after conviction of First Degree Murder. On June 12, 1995, the Legislature passed Public Chapter 492 which amended T.C.A. 40-35-501 by adding subsection (i) which states in pertinent part that,
>
> > "[T]here shall be no release eligibility for a person committing an offense on or after July 1, 1995, that is enumerated in subpart (2) of this subsection. Such person shall serve 100% of the sentence imposed by the Court less sentence credits earned and retained. Provided, however, no sentence reduction credits authorized by T.C.A. 41-21-238 or any other provision of the law shall operate to reduce the sentence imposed by the Court of more than 15%.

−16−

Prior to the passage of Public Chapter 492, release eligibility of a defendant sentenced to life was governed by T.C.A. 40-35-501(h)(1). This section required that,

> "[R]elease eligibility for each defendant receiving a sentence of imprisonment for life for First Degree murder shall occur after service of 60% of 60 years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment for life be eligible for parole until the defendant has served a minimum of twenty-five (25) full calendar years of such sentence, notwithstanding the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, or any sentence reduction credits authorized by § 41-21-236, or any other provision of law relating to sentence credits. A defendant receiving a sentence of imprisonment for life for first degree murder shall be entitled to earn and retain such sentence credits, but such credits shall not operate to make such defendant eligible for release prior to the service of twenty-five (25) full calendar years."

Public Chapter 492 created obvious confusion and uncertainty since the Legislature did not repeal T.C.A. 40-35-501(h)(1), and the two sections of the statute conflicted. The application of Public Chapter 492 remained uncertain until 1997 when the Attorney General cleared up the dilemma by stating that since the application of the amendment was unclear it was necessary to look at legislative intent. Specifically, the Attorney General's Opinion said,

> "Since the amendment's application is unclear in this regard, the legislative intent is helpful in giving the intended effect to the law. Woodruff v. City of Nashville, 183 Tenn. 483, 192 S.W.2d 1013, 1015 (Tenn. 1946). The House Judiciary Committee specifically stated that the intent of the act, in so far as a life sentence for first degree murder is concerned, was to raise the already-existing floor of time to be served as provided in § 40-35-501(h)(1), from 60% to 100% of the sixty years. Special Report to the House Judiciary Committee, Tape #1, May 3, 1995 at 672. In addition § 40-35-501(h)(1), requires that a twenty-five year minimum "floor" must be served before a defendant sentenced to life for first degree murder becomes eligible for any consideration of release eligibility. As the foregoing discussion points out, this conflicts with both the language and intent of sub-section (i), which was intended to raise the floor for

release eligibility.  When there is a conflict which cannot be resolved, long established rules of statutory construction provide that the most recently enacted statute repeals by implication any irreconcilable provisions of the former act.  Tennessee-Carolina Transportation, Inc. v. Pentecost, 362 S.W.2d 461, 211 Tenn. 72 (1962).  Since there is no way to reconcile the conflict, it is the opinion of this Office that Tenn. Code Ann. § 40-35-501(h)(1) has been repealed by implication by the enactment of Public Chapter 492, only to the extent that they conflict. American City Bank v. Western Auto [Supply], 632 S.W.2d 410, 428 (Tenn. [Ct.] App. 1981).  The only reasonable resulting interpretation would be that subsection (i) operates, in so far as it conflicts with the provisions of the existing statute governing release eligibility, to raise the floor from 60% of sixty years (the arbitrary number of years for the purpose of calculating release eligibility), to 100% of sixty years, reduced by not more than 15% of eligible credits.

At the trial, which began August 26, 1996, the trial court instructed the law that was on the books at that time.  The Court cannot find that counsel was ineffective for not asking for another jury instruction when the applicability of the amendment was so unclear that two years after the enactment of Public Chapter 492 the Attorney General had to go behind the wording of the statute itself and look to legislative intent.  The Court is mindful of the unreported case of State v. Milam . . . .  In that case there was a question of whether the killing was accidental or intentional, and the Court held that the jury verdict might have been different if 51 years incarceration instead of 25 years had been known to the jury and it was remanded for a new trial.  That was, however, not a post-conviction case.  The issue in the case at bar was one of identity and the proof on that issue was strong.  Three eyewitnesses identified the defendant as one of the shooters.  Once the identity of the defendant was established to the jury's satisfaction, it is without the realm of possibility that if the Court had instructed on the release eligibility of 51 years instead of 25 years that the jury would have convicted of a lesser included offense.

The post-conviction court went on the note that, on direct appeal, this Court had found that the circumstances of the case supported the jury's finding of premeditation.  R. Vaughn asserts that the post-conviction court erred when it found that he was not entitled to post-conviction relief on this ground.  He asserts that this Court has acknowledged that his earliest release eligibility date is fifty-one years rather than twenty-five years.  As such, R. Vaughn asserts that Counsel Sindle's failure to request such an instruction, or to appeal this issue, constitutes ineffective assistance and that he was prejudiced by this deficiency.  The State counters that the law with regard to release eligibility dates for a first degree murder sentence was unclear at the time of R. Vaughn's trial and appeal, and,

–18–

therefore, Counsel Sindle's failure to request or appeal this instruction cannot be said to be deficient.

R. Vaughn requested that the trial court instruct the jury on the earliest release eligibility date pursuant to Tennessee Code Annotated section 40-35-201(b),[3] which provides that "upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses."  When such a charge is requested by either party, section (b)(2)(A)(i) provides:

> When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses.  Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date.  Such calculation shall include such factors as the release eligibility percentage established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.

At the time of the Petitioner's trial, August of 1996, there were three statutes that mandated two different release eligibility dates for persons convicted of first degree murder.  The first, Tennessee Code Annotated section 40-35-501(g)(1) (Supp. 1993), stated:

> Release eligibility for each defendant receiving a sentence of imprisonment for life for First Degree murder shall occur after service of 60% of 60 years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment be eligible for parole until defendant has served a minimum of twenty-five (25) full calender years of such sentence. . . . A defendant receiving a sentence of imprisonment for life for first degree murder shall be entitled to earn and retain such sentence credits, but such credits shall not operate to make such defendant eligible for release prior to the service of twenty-five (25) full calendar years.

Similarly, Tennessee Code Annotated section 39-13-204 required that the jury be instructed that a

---

[3]We note that effective May 18, 1998, the Legislature amended Tennessee Code Annotated section 40-35-201, deleting subsection (b) and replacing it with a new provision that provides that juries in noncapital cases shall not be instructed on the possible penalties for the offense charged or lesser-included offenses.  This amendment does not apply to cases tried before the effective date of the amendment.  1998 Tenn. Public Acts ch. 1041 § 2.

defendant receiving a life sentence will not be eligible for parole consideration until the defendant has served "at least twenty-five (25) full calendar years of such sentence." Tenn. Code Ann. § 39-13-204(e)(2) (Supp. 1993). However, effective July 1, 1995, Tennessee Code Annotated section 40-35-501(i), made applicable to a person convicted of committing a first degree murder on or after July 1, 1995, stated that "[s]uch person shall serve 100% of the sentence imposed by the Court less sentence credits earned and retained. Provided, however, no sentence reduction credits authorized by T.C.A. 41-21-238 or any other provision of the law shall operate." This statute did not repeal section 40-35-501(g)(1). It was later interpreted, however, to mean that the earliest release eligibility date for a person convicted of first degree murder was fifty-one years, which is 85% of sixty years. See State v. Charles Golden, No. 02C01-9709-CR-00362, 1998 WL 518071, at *7 (Tenn. Crim. App., at Jackson, Aug. 21, 1998), *no perm. app. filed* (citing Attorney General Opinion 97-098 (7-1-97)); see also Drummer v. State, 6 S.W.3d 520, 522 (Tenn. Crim. App. 1999).

The Tennessee Supreme Court dealt with the issue of improper jury instructions regarding the range of punishment in State v. Cook, 816 S.W.2d 322 (Tenn. 1991). In Cook, the issue before the Court was whether a trial judge committed prejudicial error by instructing the jury on the range of punishment for a Range I offender, where the sentence range which the defendant must be sentenced under is that of a Range II offender. Id. at 324. The Court assumed that the trial court committed error when it instructed the jury and then turned to decide whether that error was harmless. Id. at 325. It concluded that Tennessee Code Annotated section 40-35-201(b)[4] gave a defendant a claimable statutory right to have the jury know the range of punishment. The Court went on to conclude that the benefits that the Legislature had in mind for the defendant when it passed this statute would be lost if the defendant were "to be sentenced to punishments greater than what the jury finding guilt was instructed would be imposed." Id. at 327. Further, "to deny this defendant that statutory right constitutes prejudice to the judicial process, rendering the error reversible . . . ." Id.

In contrast, in 1995, this Court addressed an issue similar to the issue addressed by our Supreme Court in Cook. See State v. Smith, 926 S.W.2d 267 (Tenn. Crim. App. 1995). In Smith, the defendant complained that the trial court improperly instructed the jury about a Range I punishment when he was subsequently sentenced as a Range II offender. This Court held, "Whether the defendant qualified as a Range I or Range II offender depended upon the proof offered at any subsequent sentencing hearing. Thus, the jury was aware of the possible range of punishment that could have resulted from their verdict." Id. at 271. The Court distinguished the Smith case from Cook by stating that in Cook "the only possible sentence was actually within Range II" whereas in

---

[4]This is the same statute used by J. Vaughn in this case to request that the jury be instructed on the range of punishment.

Smith the possible sentence included a Range I sentence, depending on the proof at the sentencing hearing. Id.

In Golden, the defendant's trial was held from May 17 to May 19 of 1997. Golden, 1998 WL 518071, at *1. The defendant was charged and convicted of first degree murder. Id. The jury was to determine the defendant's sentence, and the trial court instructed the jury that if it sentenced the defendant to life with the possibility of parole, the defendant would be eligible for parole after serving a minimum of twenty-five years. Id. at *7. The jury sentenced the defendant to life without the possibility of parole. Id. at *1. On appeal, we held that Tennessee Code Annotated section 40-35-501(i) mandated that the defendant serve a minimum sentence of fifty-one years, and, therefore, the trial court erred when it instructed the jury. Id. at *7-8. We stated:

> It immediately becomes apparent that the legislature in 1995 overlooked amending Tennessee Code Annotated § 39-13-204 to coincide with the 1995 amendment to Tennessee Code Annotated § 40-35-501. The statutes presently are in conflict; however, it is clear that the legislature intended to change the minimum release eligibility date for a life sentence from twenty-five (25) years to fifty-one (51) years.

Id. at *8. The Court then held that, since the homicide at issue had occurred after July 1, 1995, "the trial court erred in informing the jury of the twenty-five (25) year provision instead of the fifty-one (51) year provision." Id. The Court went on to conclude that the error was not harmless beyond a reasonable doubt, and we remanded the case for a new sentencing hearing.

In State v. Reco R. Douglas, No. 02C01-9711-CR-00443, 1998 WL 803410 (Tenn. Crim. App., at Jackson, Nov. 20, 1998), *no perm. app. filed*, the Court again addressed whether a trial court erred when it instructed the jury on release eligibility dates. The defendant was charged and convicted of first-degree felony murder on December 3, 1994. The trial court instructed the jury that, if it sentenced the defendant to life with the possibility of parole, the defendant would be eligible for parole in less than two years, when, in fact, the defendant would have to serve a minimum of twenty-five years. Id. at *2.[5] The Douglas Court distinguished the case before the Court from Smith, stating that, at the time of the Smith trial, the sentencing status of the defendant had "not been established and the [S]tate's proof for a higher range may fail. In other words, in those cases, the instructed minimum sentence is still a possibility." Id. The Court then held that, in the case before it, *at the time of trial* the defendant was ineligible for parole before serving twenty-five years. Id. The Court cited Cook for the proposition that "'[i]t is widely perceived by those who observed the operations

---

[5]Since this crime occurred prior to the July 1, 1995, amendment to the statute, the proper instruction was that the defendant would have to serve a minimum of twenty-five years, not fifty-one years.

of our trial courts in previous times, when juries had the additional responsibility of setting punishment, that often they seemed to find guilt of a crime not necessarily most strongly suggested by the evidence, but one the punishment for which suited their sense of justice in that case.'" Id. (citing Cook, 916 S.W.2d at 326). The Court held that the instruction misled the jury, and it reversed and remanded the case for a new trial.

In State v. Meyer, 994 S.W.2d 129 (Tenn. 1999), the Tennessee Supreme Court reversed and remanded a case for a new trial where the defendant was convicted of two counts of rape of a child after the jury was erroneously instructed that, if convicted, he would have to serve at least 5.73 years, rather than the entire sentence undiminished. Id. at 132. The Supreme Court held that the defendant was prejudiced by the erroneous jury instruction, and it was conceivable that the defendant would have been convicted of a lesser offense had the jury known that he would not have been eligible for early release. Id. at 131-32 (citing Cook, 816 S.W.2d at 322).

Our Court dealt with a similar issue in State v. Bryan A. Milam, No. 01C01-9712-CC-00557, 1999 WL 701419 (Tenn. Crim. App., at Nashville, Sept. 10, 1999), *no perm. app. filed*. In that case, the defendant was convicted of two counts of first degree murder for a crime he committed on May 15, 1996, and he was sentenced to life imprisonment for each count. Id. at *1. The trial court instructed the jury that, if convicted, the defendant would have to serve twenty-five years before his earliest release eligibility date when, in fact, he would have to serve fifty-one years. Id. at *5. This Court cited Myer and Douglas, and it concluded that "the defendant was prejudiced by the trial court's erroneous instruction." Id. at *6. Further, the Court stated, "It is conceivable that the defendant would have been convicted of a lesser offense had the jury known that he would not have been eligible for release for fifty-one years as opposed to twenty-five years." Id. The Court reversed the conviction and remanded the case for a new trial.

In State v. Mitchell Shephard, No. E2000-00628-CCA-R3-CD, 2001 WL 767010 (Tenn. Crim. App., at Knoxville, July 3, 2001), *perm. app. granted* (Tenn. Dec. 2, 2002), this Court addressed whether the trial court committed reversible error by improperly instructing the jury with regard to the defendant's punishment. By the time of the Shephard case, the Legislature had again changed the statute and had mandated that the jury not be instructed at all about punishment in first degree murder cases where the State was not seeking the death penalty. Id. at *11. The trial judge, however, had instructed the jury on punishment. Id. Further, the trial judge instructed the jury that the defendant would be eligible for parole after serving a minimum of twenty-five years, rather than fifty-one years. This court held that the instructional error was reversible. Id. It stated, however, "In fairness to the trial court, we again recognize that the trial court gave the 25-year charge as it is stated in Tenn. Code Ann. § 39-13-204(e)(2)." Id. at *12. The court also said, "In spite of the obvious conflict between Tenn. Code Ann. §§ 39-13-204(e)(2) and 40-35-501(i), the legislature has still not amended Tenn. Code Ann. § 39-13-204(e)(2) (Supp. 2000)." Id. It is hoped that such an amendment will be made to avoid the inconsistency." Id. The Court remanded the case for a new

sentencing hearing.

Considering the contentions of the parties, we think the issue before us is twofold. First, we must decide whether Counsel Sindle was ineffective for failing to request that the jury instruction with regard to release eligibility dates be changed from twenty-five years to fifty-one years. Next, we must decide whether Counsel Sindle was ineffective for failing to appeal this issue. Accordingly, the time line of the events of this case is relevant. R. Vaughn's case was tried in August of 1996, and the judgment was entered August 26, 1996. R. Vaughn appealed his case to this Court, and the record was filed with this Court on March 11, 1997. R. Vaughn's brief was filed on May 6, 1997, the State's brief was filed on July 3, 1997, and no oral argument was requested. The case was assigned to the Court in January of 1998, and the Court released the opinion affirming the convictions and sentences in this case on April 14, 1998.

As previously stated, the first issue we must decide is whether Counsel Sindle was ineffective for failing to request a jury instruction that, if the jury convicted R. Vaughn of first degree murder, he would be ineligible for parole until he served fifty-one years. At the time of the trial, the Legislature had changed one of the relevant statutes, making the earliest release eligibility date for those convicted of first-degree murder fifty-one years rather than twenty-five years. Since, however, the newly enacted statute did not repeal the twenty-five year statute the law was unclear as to the applicable release eligibility date. At the time of R. Vaughn's trial, the only two cases that were decided were Cook and Smith, and both of those cases dealt with jury instructions about Range I and Range II sentences. Furthermore, the Attorney General's statutory interpretation opinion was not released until July of 1997, almost one year after the trial. While it is arguable that Counsel Sindle could have anticipated the Attorney General's statutory interpretation, or our subsequent holdings affirming the Attorney General's Opinion, we do not find his performance deficient for failing to do so. As previously stated, Cook was not a first degree murder case, and, as we noted in many of our subsequent holdings, the Legislature's failure to repeal the twenty-five year release eligibility statute made this area of the law confusing. Given this chronology of events, we cannot conclude that Counsel Sindle's failure to request the jury instruction at trial was ineffective. Furthermore, R. Vaughn cannot show prejudice in this regard. To show prejudice, he would have to prove that, had Counsel Sindle requested the fifty-one year instruction, the trial court would have instructed the jury accordingly. Considering the state of the law at the time of this trial, however, it is simply impossible to assume that the trial court would have so instructed the jury.

Conversely, in accordance with the aforementioned case law, R. Vaughn could possibly show prejudice with respect to Counsel Sindle's failure to raise this issue on appeal. However, we conclude that R. Vaughn has not shown that Counsel Sindle's failure to raise this issue on appeal was deficient. We initially note that Counsel Sindle could only have brought this issue before the Court under the plain error doctrine, as the instructional error would have been waived for his failure to object to it at trial or in the motion for new trial. See Tenn. R. App. P. 52(b). Again, while it is

arguable that Counsel Sindle could have anticipated this statutory interpretation, and our subsequent holdings in Golden, Douglas, and Milam, we do not find his performance deficient for failing to do so. The record on R. Vaughn's direct appeal was submitted on March 11, 1997, and R. Vaughn's brief was filed on May 6, 1997. The parties submitted the case on briefs, waiving oral argument, and the case was assigned to this Court on January 21, 1998. The Attorney General's Opinion interpreting the relevant statute was not released until July of 1997, two months after Counsel Sindle submitted the brief in this case. Further, none of our opinions confirming the Attorney General's Opinion were released until a year after Counsel Sindle filed his brief. We simply cannot conclude that Counsel Sindle's representation fell below an objective standard of reasonableness because he did not anticipate this interpretation of the statute.

As further support for our holding, we highlight again, by way of analogy, our previous analysis of the Page decision and subsequent post-conviction decisions holding that a petitioner's trial counsel was not ineffective for failing to raise the Page "knowingly" issue on appeal when the law was unclear. Again, ineffective assistance of counsel cases should be limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue. Eady, 2004 WL 587639, at *8. This issue is without merit.

## B. Adequate Trial Preparation

Lastly, R. Vaughn asserts that Counsel Sindle was ineffective by failing to adequately prepare for trial. He contends that Counsel Sindle failed to prepare his case for trial and failed to adequately confer and consult with R. Vaughn about the course of the investigation and trial proceedings. Specifically, he asserts that Counsel Sindle: (1) failed to conduct any investigation to prepare for the motion to suppress; (2) failed to investigate and call alibi witnesses; (3) failed to develop information with regard to other suspects; (4) failed to conduct any investigation with any of the State's witnesses; (5) failed to consult him about waiving a sequestered jury; (6) failed to offer proof at his sentencing hearing; (7) failed to properly object and request a mistrial when Detective Morrow said that R. Vaughn was incarcerated in violation of a motion in limine; (8) failed to present any mitigating factors at R. Vaughn's sentencing; and (9) failed to adequately research the law regarding jury instructions. The post-conviction court found that Counsel Sindle's performance was not deficient for any of these reasons.

We conclude that the evidence does not preponderate against the trial court's findings of fact. Further, we conclude that R. Vaughn has not met his burden of proving that Counsel Sindle's representation of him fell below an objective standard of reasonableness. As to R. Vaughn's first contention, the post-conviction court found that Counsel Sindle's testimony was credible, and Counsel Sindle testified that R. Vaughn told him, unequivocally, that his Alabama relatives were not to be involved in this case. For that reason, Counsel Sindle did not travel to Alabama and interview these witnesses. Counsel Sindle filed a motion to suppress, but the trial court denied that motion,

–24–

finding that the search of the residence comported with search and seizure law. R. Vaughn has not proven that Counsel Sindle's performance was deficient in this regard. Further, the testimony of the Alabama relatives that was presented at the post-conviction hearing was insufficient to prove that the search was improper. Accordingly, R. Vaughn has not shown prejudice.

As to R. Vaughn's second contention, that Counsel Sindle failed to adequately investigate Robin Rice Malone's proposed testimony, and failed to call Thomas Walker or Sammy Alexander. The post-conviction court found that Counsel Sindle attempted to develop alibi testimony and to attack the State's witnesses, but the weight of the direct eye-witnesses testimony was "extremely convincing." Robin Rice Malone was one witness who was able to testify that she was with R. Vaughn on the night of the shooting, and they were not at the scene of the shooting. Counsel Sindle called her as a witness, and she was impeached by a prior inconsistent statement that she made to Detective Morrow. Counsel Sindle testified that he asked Malone if she had given any other statements to police, and Malone indicated that she had not. He was, therefore, surprised by this impeachment. We conclude that this was not deficient. Counsel Sindle found Malone to be a credible witness and attempted to ensure that she had not given other information to police. This cannot be said to be deficient performance. R. Vaughn also alleges that Counsel Sindle was ineffective for failing to call Thomas Walker. The post-conviction court found that Walker's testimony was inadmissible, and it found that "Walker did not make a credible witness . . . ." The evidence does not preponderate against these findings. Finally, Counsel Sindle said that there were credibility problems with many of the witnesses, and, therefore, he had to decide whether the witness would do more harm than good to R. Vaughn's case. Counsel Sindle did not call Sammy Alexander because Alexander had previously been convicted of voluntary manslaughter. This was a strategic decision, and we will not second guess it on appeal.

R. Vaughn's third assertion is that Counsel Sindle failed to develop information with regard to other suspects, namely Charles Crenshaw. He asserts that Charles Crenshaw was allegedly shot by the victim on a prior occasion. Pretrial, the trial court ruled that Detective Morrow could be asked if she had developed any other suspects in the case, but she could not be asked about specific names. The post-conviction court found that "trial counsel concluded that if he had pursued a . . . . line of qu[e]stions about other possible suspects that" the response would be that "all the evidence pointed to your client." Therefore, this decision was a strategic one. Further, R. Vaughn presented no evidence that further investigation would have assisted his defense. Charles Crenshaw did not testify at the post-conviction hearing. Further, Detective Morrow did not testify about Charles Crenshaw at the post-conviction hearing.

R. Vaughn's fourth assertion is that Counsel Sindle failed to conduct any investigation with any of the State's witnesses. Counsel Sindle testified that he heard many of the witnesses testify at J. Vaughn's trial, and he relied upon discovery materials when he prepared for trial. Especially in light of the fact that many of the State's witnesses testified and were cross-examined in J. Vaughn's

−25−

trial, which was only a few months before R. Vaughn's trial, we cannot conclude that Counsel Sindle's performance was deficient. Further, R. Vaughn has failed to show prejudice by proving how more investigation would have aided his defense.

R. Vaughn's fifth assertion is that Counsel Sindle was ineffective for failing to request a sequestered jury. Counsel Sindle said that he did not request a sequestered jury because he believed that it would disadvantage R. Vaughn. He said that, if you have a sequestered jury, you run the risk that the jury will be upset that they cannot go home, and the jury may not be as willing to take their time with the evidence. The post-conviction court found that the jury was questioned extensively about whether it had read or heard about the case, and none of them had. Each juror told the trial court that they had not formed an opinion about R. Vaughn's guilt or innocence. The decision concerning whether to request that the jury in this case be sequestered a tactical decision that we will not second guess. Sequestered jurors are sometimes impatient juries, and, since Counsel Sindle was satisfied that the jury would decide the case solely on the facts presented in court, Counsel Sindle was not ineffective for failing to request a sequestered jury. Further, R. Vaughn has not proven how he was prejudiced in this regard.

R. Vaughn's sixth contention is that Counsel Sindle failed to offer proof at his sentencing hearing. Counsel Sindle testified that, while he could have argued some mitigating factors at the sentencing hearing, his arguments would have lacked any validity. The trial court agreed and rejected all of the mitigating factors suggested by R. Vaughn. Accordingly, because no mitigating factors apply, R. Vaughn cannot show how he was prejudiced by Counsel Sindle's failure to offer proof of them at the sentencing hearing.

R. Vaughn's seventh contention is that Counsel Sindle was ineffective for failing to object or request a mistrial when Detective Morrow violated a motion in limine by testifying that R. Vaughn was incarcerated. Counsel Sindle said that he did not immediately object to this testimony because he did not want to call the jury's attention to this fact. Counsel Sindle expressed his concern to the trial court, and the trial court, at a bench conference, told the District Attorney to instruct his witnesses to be more careful about R. Vaughn's prior incarceration. Counsel Sindle did not request a mistrial because he had an alibi witness that he knew was available, and he thought that it was in R. Vaughn's best interest to move forward with the trial. We conclude that, even if Counsel Sindle's performance was deficient for failing to object on the record, R. Vaughn cannot show prejudice. Had Counsel Sindle objected, the trial court would have instructed the jury to disregard that statement by Detective Morrow, and the trial would have proceeded. Therefore, R. Vaughn is not entitled to post-conviction relief based upon this issue.

R. Vaughn's eighth contention is that Counsel Sindle was ineffective for failing to present any mitigating factors at sentencing. Counsel Sindle testified that there were no mitigating factors that applied, and the trial court agreed. Because there were no appropriate mitigating factors,

Counsel Sindle was not ineffective for failing to argue them during sentencing.

R. Vaughn's final assertion is that Counsel Sindle was ineffective for failing to adequately research the law with regard to jury instructions. As stated above, Counsel Sindle was not ineffective in this regard. This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment dismissing R. Vaughn's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE